**Morris COFMAN, et al., Plaintiffs, Appellants,**

v.

**ACTON CORPORATION, et al., Defendants, Appellees.**

**No. 91–1847.**

United States Court of Appeals, First Circuit.

Heard Feb. 7, 1992.

Decided March 6, 1992.

---

ALDRICH, Senior Circuit Judge.

Twelve partnerships, hereinafter Partnerships,[1] having equal claims against defendant Acton Corporation,[2] engaged in settlement negotiations of a prior suit. Acton offered $60,000; ($5,000 apiece); Partnerships countered with $180,000, and Acton responded with $120,000. Partnerships were agreeable to $120,000 if there were an added "sweetener," and suggested stock warrants, but Acton did not wish this complication. Instead, Section 2.2 was added to each of the twelve settlement contracts; hereinafter the agreement:

> [T]he Partnership shall be entitled to receive, upon written demand made within the three years following the execution of the Settlement Agreement (the "Exercise Date"), the following one time payment: the sum of "X" times a multiple of 7,500 where "X" equals the "price" of one share of Acton Corporation's common stock on the Exercise Date less $7.00. The "price" on the Exercise Date shall be equal to the average closing price of one share of the common stock of Acton Corporation on the American Stock Exchange for any period, selected by the Partnership, consisting of thirty (30) consecutive trading days prior to the Exercise Date. Acton CATV shall make such payment as necessary within 30 days after receipt of the written demand. The Partnership's rights hereunder shall expire three years after the date of this Agreement and shall not be assignable.

The manifestly implicit concept, quite apart from the parol evidence, is that if Acton did better, presumably reflected in its stock, it could afford to pay more for the settlement. At the same time, the chances that this would bear much fruit, if any, were not considered large, as Acton was not doing well, and its stock was fluctuating between $1.50 and $3.12. These circumstances are to be considered with the contract language regardless of the parol evidence rule. *Clark v. State Street Trust*

Robert S. Groban, Jr. with whom Asher Fensterheim, David S. Poppick and Fink Weinberger P.C. were on brief, for plaintiffs, appellants.

Laura Steinberg with whom Cynthia M. Clarke and Sullivan & Worcester were on brief, for defendants, appellees.

Before TORRUELLA, Circuit Judge, ALDRICH and BOWNES, Senior Circuit Judges.

---

1. Eleven, only, are plaintiffs; the twelfth's presence would spoil diversity. It has, accordingly, sued in the state court, with a stipulation that judgment there would correspond with judgment herein. For convenience in narration we will assume that all twelve are present.

2. Two other corporate defendants are not presently relevant.

*Co.,* 270 Mass. 140, 152, 169 N.E. 897 (1930); *Robert Industries, Inc. v. Spence,* 362 Mass. 751, 753, 291 N.E.2d 407 (1973), and cases *post.*

About a year after the making of the agreement, Acton's stock not having increased in price, it concluded that there were psychological market advantages in artificially shrinking the number of outstanding shares, and thereby increasing the per share price. It accordingly executed a so-called reverse stock split, as the result of which each stockholder owned one-fifth the original number of shares, with the new shares having five times the par value and, at the outset, approximately five times the immediately preceding price on the Stock Exchange, viz., substantially more than the $7.00 figure in the agreement.

Surprisingly, Acton did not consult Partnerships before engaging in this maneuver; it merely sent a letter explaining that it was of no consequence.

This is to advise you that the stockholders of Acton Corporation have authorized a one-for-five reverse stock split of Acton Corporation's common shares effective June 25, 1987. This means that one share of stock will represent five shares of Acton Corporation's common stock prior to that date. The reverse stock split will affect Section 2.2 of the above-referenced Agreement such that the price $7.00 as referenced in such Section shall become $35.00.

Partnerships immediately rejected this conclusion. At the same time their present contention that Acton's letter, sent the very day of the change, was a recognition of its substantive effect on the agreement, and an "attempted amendment," is a flight of fancy.

The fight was on. Under Partnerships' interpretation of the agreement the twelve Partnerships together are owed $1,218,600 for their abandoned $60,000, based on a per share price of $20.54, although, had the number of shares not been reduced by the reverse split the per share price would have been some $4.11, sparking nothing. After a bench trial the court, in an opinion reported at 768 F.Supp. 392 (D.Mass.1991), found for defendants. Partnerships appeal. We affirm.

■ Partnerships' position is simple and straightforward. This is precisely the way the agreement reads; it is unambiguous, and integrated,[3] and even were parol evidence admissible, which they deny, there was no prior discussion suggesting exceptions. The court, taking up this last fact, stated that the agreement "did not address an eventuality such as a reverse stock split," and the very fact that the parties had not considered it supplied the answer. "An expression may be complete … and yet ambiguous. Indeed, human limitations make it inevitable that every expression will be less than complete in a thoroughly comprehensive sense. Ambiguity will remain about some matters that might have been addressed and were not."[4] 768 F.Supp. at 395. Finding that the parties had not thought about dilution—a finding that binds Partnerships here—the court found the omission was an ambiguity in the agreement, and resolved it by concluding that the reasonable provision would have been that stock splits would have no effect.

We might turn one of Partnerships' arguments back on them in support of this result. The agreement provided that Partnerships had three years in which to pick a thirty day high price. During the negotiations Partnerships inquired what would happen if, during that period, Acton went private, as a result of which business success would not be reflected on the Exchange. Interestingly enough, while Partnerships are normally hostile to pre-agreement evidence, they narrate this. Acton

---

**3.** 11. *Integration.* This Agreement contains the entire agreement between the parties hereto with respect to the transactions and matters contemplated herein and … supersedes all prior agreements, if any, between the parties hereto. …

**4.** More simply put, "Paragraph 6 is not self-interpreting—*no form of words is*—and the evidence could be received and used to elucidate its meaning in context." *See Antonellis v. Northgate Construction Corp.,* 362 Mass. 847, 851, 291 N.E.2d 626 (1973). (Emphasis supplied).

"refused to give them *any* protection if Acton went private ... the Partnerships were *'at risk'* on that issue." (Emphasis in original.) During trial—not subsequently repeated—the court suggested that this indicated Partnerships also took the risk if Acton made a stock split *in* creasing the number of shares. Partnerships assert this implication. If there is any inference, we would draw just the opposite. Inclusio unius, exclusio alterius. But certainly this did not mean that Partnerships were accepting any and all defeating actions that Acton might take.

The court ultimately so concluded. "It defies common sense" that Partnerships would have agreed that Acton could effectively escape the specified consequences of a rising market price by increasing the number of shares. And if Partnerships would not suffer from any increasing, it would follow, since a contract must be construed consistently, *Charles I. Hosmer, Inc. v. Commonwealth,* 302 Mass. 495, 501, 19 N.E.2d 800 (1939); Restatement (Second) of Contracts, § 205(5) (1981), Acton should not suffer from any decreasing.

■ No doubt recognizing this symbiosis, when the district court inquired, as later did we, whether Acton could have avoided all liability under the agreement simply by increasing the number of shares, counsel answered affirmatively. The court characterized his proffered concession as "gallant." We can only say that if this particular counsel would have been too gallant to make a claim, surely some less chivalrous could have been found. How could so meaningless an undertaking have been considered a sweetener? It is a fundamental principle that a contract is to be construed as meaningful and not illusory. As the court said in *Clark,* 270 Mass. at 153, 169 N.E. 897,

> The construction of a written instrument to be adopted is the one which appears to

be in accord with justice and common sense and the probable intention of the parties. It is to be interpreted as a business transaction entered into by practical men to accomplish an honest and straightforward end.

It is true that contracts cannot be rewritten simply to "rescue a firm from a sinkhole of its own design." *See RCI Northeast Services Division v. Boston Edison Co.,* 822 F.2d 199, 205 (1st Cir.1987). Adding a whole new provision is normally permissible only when additional terms are "essential to a determination." *Fay, Spofford & Thorndike, Inc. v. Mass. Port Authority,* 7 Mass.App. 336, 343–44, 387 N.E.2d 206, 210 (Mass.App.1979); *D. Federico Co. v. New Bedford Redevelopment Authority,* 723 F.2d 122, 129 (1st Cir.1983); Restatement (Second) of Contracts, § 204 (1981). Assuming that rule applicable, which we need not decide, Partnerships contends there was no necessity here; they may have been affirmatively content at the time of contracting to there being no anti-dilution provision. There are two answers to this. The first is that the court has found the parties gave no thought to dilution, and this finding cannot be said to be plainly wrong. Second, this is precisely a case where to read the contract as meaning that Partnerships should not suffer by dilution—and hence Acton by reverse dilution—is a necessity, or "essential to a determination." There is every reason to presume Partnerships did not intend to acquire nothing,[5] and saving from unenforceability ranks as a necessity. *Local Div. 589 Amalg. Transit Union v. Commonwealth of Massachusetts,* 666 F.2d 618, 637 (1st Cir.1981), *cert. denied,* 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982); *cf. National Audubon Society v. Watt,* 678 F.2d 299, 310 (D.C.Cir.1982) (saving from illegality). *See also, Berger v. Siegel,* 329 Mass. 74, 75, 106 N.E.2d 429 (1952); *Talbot*

---

**5.** We do not pause over Partnership's sought analogy to convertible debentures, where the rule is that anti-dilution must be expressly stated. *Broad v. Rockwell International Corp.,* 642 F.2d 929, 940–45 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981); *Parkinson v. West End Street Ry.,* 173

Mass. 446, 53 N.E. 891 (1899). These are formal, and complicated commercial structures, prepared with care for the general public. Purchasers have the bonds in any event. Here we have a simple agreement between individuals, not even assignable.

**498**

*v. Rednalloh Co.,* 283 Mass. 225, 230, 186 N.E. 273 (1933).

Whether we reach that result by implying a provision to meet a circumstance not envisaged by the parties, or by construing the word "share" as including following the res, is immaterial. "[A] legal instrument is to be construed with reference to all of its language and to its general structure and purpose and in the light of the circumstances under which it was executed. These factors may qualify and control the literal signification of particular terms and phrases as effectually as if express qualifying words were found in the instrument." *Radio Corp. of America v. Raytheon Mfg. Co.,* 300 Mass. 113, 117, 14 N.E.2d 141 (1938). In any event, the rules of construction do not call for Partnership's wooden interpretation.

*Affirmed.*