PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 12-3434
_____


G. DAVID JANG, M.D., an individual,
                                          *Appellant*

v.

BOSTON SCIENTIFIC SCIMED, INC., a corporation;
BOSTON SCIENTIFIC CORPORATION, a corporation

_____


On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-10-cv-00681)
District Judge:  Honorable Sue L. Robinson
_____


Argued: July 10, 2013

Before: GREENAWAY, JR., SLOVITER, and BARRY,
*Circuit Judges*

(Filed:  September 5, 2013)

Jed I. Bergman, Esq. [Argued]
Henry B. Brownstein, Esq.
Kasowitz, Benson, Torres & Friedman
New York, NY 10019

Richard H. Cross, Jr., Esq.
Tara M. DiRocco, Esq.
Cross & Simon
Wilmington, DE 19801-0000

*Attorneys for Appellant*

Matthew M. Wolf, Esq. [Argued]
Edward Han, Esq.
John Nilsson, Esq.
Arnold & Porter
Washington, DC 20004

Pilar G. Kraman, Esq.
Karen L. Pascale, Esq.
Young, Conaway, Stargatt & Taylor
Wilmington, DE 19801

*Attorneys for Appellees*

_____

OPINION

_____

SLOVITER, *Circuit Judge*.

This appeal concerns a multimillion-dollar contract dispute over the distribution of profits from medical patents. In particular, it involves U.S. Patent No. 5,922,021 ("the '021 patent"), awarded to appellant G. David Jang for coronary stent technology. Jang, a doctor and inventor, sued Boston Scientific Corporation ("BSC"), the company to which Jang assigned his coronary stent patents, for breach of the patent assignment agreement ("Agreement"). The Agreement requires BSC to share profits from the patents with Jang, including any damages it recovers from third-party infringers. In 2010, BSC settled a claim against the Cordis Corporation ("Cordis") for infringement of the '021 patent in combination with a claim that Cordis had against BSC. The net result was that BSC made a payment to Cordis, and the parties exchanged several patent licenses. BSC then denied that it had recovered any damages that it was obligated to share with Jang, and Jang sued.

The central question in the case is whether the Agreement provision that requires BSC to share "any recovery of damages" from third-party infringers – § 7.3(c) – extends to the benefits that BSC received in the Cordis settlement. According to Jang's allegations, BSC's infringement claim won it a significant return: a multibillion-dollar "offset" in its damages payment to Cordis, as well as

3

valuable patent licenses. BSC contends that neither of these qualify as "damages" under the plain meaning of § 7.3(c). Jang argues that they do qualify as "damages," or in the alternative, that BSC violated the implied covenant of good faith and fair dealing by structuring a settlement to thwart the purpose of § 7.3(c). In addition, Jang argues that BSC violated the Agreement's anti-assignment provision, § 9.4, by licensing his patents to Cordis.

The District Court granted judgment on the pleadings for BSC, and denied his post-judgment motion for reconsideration and leave to amend his complaint to add the § 9.4 claim. We must decide whether it did so in error.

## I.    Background

### A. *The Assignment Agreement*

In 2002, Jang assigned a series of his coronary stent patents to BSC through its wholly owned subsidiary, Boston Scientific Scimed, Inc. ("Scimed"). BSC and Scimed develop, manufacture and market medical devices. The assignment agreement granted BSC the exclusive rights to develop and sell stents using Jang's patents, and to prosecute patent-infringement suits against third parties. In return, BSC paid Jang approximately $50 million up front. It also agreed to pay him ten percent of future profits from his patents – in the Agreement's terminology, ten percent of "Net Sales" of "Contingent Payment Products" – with the payments capped at $60 million.[1] Finally, BSC agreed that if its profits from

---

[1] The Agreement provided that BSC would pay Jang $10 million towards this $60 million cap if it had not taken certain

4

the Jang patents reached $2.5 billion within five years, it would pay Jang an additional $50 million.

The Agreement defined "Net Sales" to include revenue from BSC's own sales as well as any damages obtained from third-party infringers. Section 7.3(c), the key provision in this case, directed that "any recovery of damages" from an infringement "suit or settlement" should first be used to pay BSC's legal expenses; "the balance" is deemed part of BSC's Net Sales, such that BSC must pay Jang ten percent, and also count the recovery toward the $2.5 billion threshold. App. at 112. Section 7.3(c) does not extend to "special or punitive damages." *Id.*[2]

---

steps toward the marketing of Contingent Payment Products by 2004. BSC made this payment to Jang.

[2] The full text of the provision is as follows:

> Any recovery of damages by Scimed in a suit brought pursuant to the provisions of this Section 7.3 shall be applied first in satisfaction of any unreimbursed expenses and legal fees of Scimed relating to the suit or settlement thereof. The balance, if any, remaining after Scimed has been compensated for expenses shall be retained by Scimed; provided, that any recovery of ordinary damages based upon such infringement shall be deemed to be "Net Sales" and upon receipt of such recovery amount, Scimed shall pay Jang as additional Earn Out from such recovery amount an amount calculated in accordance with Section 3.1(c) to

The Agreement also included an anti-assignment provision, § 9.4, which prohibited either party from "assign[ing] its rights or obligations" under the Agreement "without the prior written consent of the other party," and required any assignee to agree in writing "to assume all of the obligations of the assignor" under the Agreement. App. at 116.[3]

### B. *The Cordis Litigation and Settlement*

---

> reimburse Jang for payments due in respect of lost sales of Contingent Payment Products. Any such recovery shall be count[ed] toward Net Sales as of the date of the infringement for purposes of Section 3.1(d). The allocation described in this Section 7.3(c) shall not apply as to special or punitive damages.

App. at 112.

[3] Section 9.4 provides in pertinent part that

> neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld in the case of any assignment; *provided* that the proposed assignee under this Section 9.4 agrees in writing to assume all of the obligations of the assignor party under this Agreement.

App. at 116.

In 2003, Cordis, another manufacturer of coronary stents, sued BSC in the District of Delaware for infringement of two Cordis-owned patents.  BSC filed a counterclaim against Cordis for infringement of Jang's '021 patent.  The claims were severed; in 2005, separate juries returned verdicts finding that Cordis had infringed the Jang patent, and that BSC had infringed the Cordis patents.  The United States Court of Appeals for the Federal Circuit affirmed both verdicts.

BSC was therefore entitled to damages from Cordis for infringement of the Jang patent, and Cordis was entitled to damages from BSC for infringement of Cordis' patents.  Jang's complaint alleges that each company owed the other several billion dollars.  A damages trial was scheduled for February 2010.

On the eve of the damages trial, BSC and Cordis settled.  The settlement agreement provided for only one cash payment: approximately $1.725 billion from BSC to Cordis.  Jang alleges, and BSC appears to admit, that this represented the net difference between the companies' claims:  Cordis' damages minus BSC's damages.  As BSC wrote in its brief, the damages to which it was entitled for the Jang-patent infringement translated into a "settlement offset" against the damages it owed Cordis.  Appellees' Br. at 19.  Jang alleges that BSC's payment to Cordis was offset by several billion dollars.

The settlement also entailed an exchange of licenses.  BSC granted Cordis non-exclusive, perpetual, irrevocable, fully paid-up and retroactive licenses on eleven Jang patents, including the '021 patent.  Cordis granted BSC non-

exclusive, perpetual, irrevocable, fully paid-up and retroactive licenses on ten Cordis patents. Each company released its infringement claims against the other.

### C. Jang's Contract Suit against BSC

Following the settlement, BSC denied that it had recovered any damages that it was obligated under the Agreement to share with Jang. Jang filed suit. He brought the case in the Central District of California on diversity grounds; it was transferred to the District of Delaware to follow the litigation between BSC and Cordis.

Jang's complaint presented five state-law claims: (1) that BSC breached the Agreement by refusing to pay Jang his share of the infringement recovery; (2) that BSC breached the Agreement by refusing to pay Jang his share of the value from the licensing of his patents; (3) breach of the implied covenant of good faith and fair dealing; (4) breach of fiduciary duty; and (5) a demand for the enforcement of an equitable lien that Jang had claimed on BSC's right to recover from Cordis.

Each party moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Jang, in subsequent briefing, alleged that BSC had also breached the Agreement's anti-assignment provision, § 9.4, by licensing his patents without his permission. He noted that he "would be prepared to amend" the complaint to add this claim. App. at 559. He did not, however, amend the complaint.

The District Court granted judgment for BSC. Of relevance here, it held that the value BSC obtained in the

Cordis settlement did not constitute a "recovery of damages" under § 7.3(c) of the Agreement, and that there could be no breach of the implied covenant of good faith and fair dealing absent a breach of the contract's express terms. The Court declined to address Jang's § 9.4 claim on the ground that Jang had not pled it, and dismissed Jang's complaint with prejudice. Jang timely moved for reconsideration and for leave to amend the complaint. The District Court denied the motion.

Jang now appeals. He argues (1) that the District Court erred in dismissing his first breach-of-contract claim; (2) that it erred in dismissing his alternative claim for breach of the implied covenant of good faith and fair dealing; (3) that it erred in refusing to consider his § 9.4 claim and dismissing the complaint with prejudice; and (4) that it erred in denying his motion for reconsideration and leave to amend.[4]

## II.    Jurisdiction and Applicable Law

The District Court had diversity jurisdiction pursuant to 28 U.S.C. § 1332. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

The Agreement includes a choice-of-law provision specifying that Massachusetts law shall govern its interpretation. If there is no controlling decision from a state's highest court, we must "predict" how that court would

---

[4] Jang appeals the denial of the motion for reconsideration only to the extent it related to the motion for leave to amend.

decide, giving "due regard, but not conclusive effect" to decisions from lower courts. *Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000).

### III.    Analysis

#### A.  *Breach of Contract*

Jang claims that BSC breached § 7.3(c) of the Agreement by refusing to pay him a share of the damages it recovered for Cordis' infringement of the Jang patent.  The District Court found that BSC had not breached the Agreement because it had not recovered any "damages."  We exercise plenary review of the District Court's grant of judgment on the pleadings.  *See Knepper v. Rite Aid Corp.*, 675 F.3d 249, 257 (3d Cir. 2012); FED. R. CIV. P. 12(c).  We may affirm "only if, viewing all the facts in the light most favorable to the nonmoving party, no material issue of fact remains and the moving party is entitled to judgment as a matter of law."  *Id.*

Under Massachusetts law, the interpretation of a contract is, in the first instance, a matter of law, but the meaning of an ambiguous provision is a question of fact.  *See Seaco Ins. Co. v. Barbosa*, 761 N.E.2d 946, 951 (Mass. 2002).  "Contract language is ambiguous 'only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.'"  *S. Union Co. v. Dep't of Pub. Utils.*, 941 N.E.2d 633, 640 (Mass. 2011) (quoting *Citation Ins. Co. v. Gomez*, 688 N.E.2d 951, 953 (Mass. 1998)).

10

The District Court found that § 7.3(c) unambiguously referred to "cash received or monetary profits." *Jang v. Bos. Scientific Scimed, Inc.*, 817 F. Supp. 2d 409, 414 (D. Del. 2011). It reasoned that the provision's terms – "damages," "the balance," "upon receipt," and "from such recovery amount" – plainly allude to monetary gain. *See id.* at 414-15. We do not disagree. *See* BLACK'S LAW DICTIONARY 445 (9th ed. 2009) (defining "damages" as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury").

Jang argues for a broader reading of "damages," but in vain; the cases he cites simply address what kinds of loss damages can compensate. *See Salvas v. Wal-Mart Stores, Inc.*, 893 N.E.2d 1187, 1216-17 (Mass. 2008) (noting that "damages" means "'the equivalent in money for the actual loss sustained by the wrong of another'") (quoting *F.A. Bartlett Tree Expert Co. v. Hartney*, 32 N.E.2d 237, 240 (Mass. 1941)); *Hazen Paper Co. v. U.S. Fid. & Guar. Co.*, 555 N.E.2d 576, 583-84 (Mass. 1990) (finding that "damages" in an insurance policy covered costs of environmental cleanup); *Berube v. Selectmen of Edgartown*, 147 N.E.2d 180, 185 (Mass. 1958) ("'Damages' is the word which expresses in dollars and cents the injury sustained by a plaintiff. . . ."). These cases simply confirm that the ordinary meaning of "damages" is a sum of money.[5]

---

[5] At oral argument, BSC appeared to take the position that the term "damages" is limited to a monetary sum awarded by a court or jury. That reading is foreclosed by the text of § 7.3(c), which applies to damages recovered "in a suit or settlement."

The conclusion that § 7.3(c) refers only to monetary recoveries does not end the analysis, however, because Jang argues that the infringement claim did produce a monetary gain for BSC: the cash offset. Furthermore, he contends that § 7.3(c) uses monetary terms only because the parties did not consider the possibility of a non-monetary settlement. He argues that the provision is therefore ambiguous with respect to BSC's recovery of licenses, and must be construed to require BSC to share the value of the licenses with him.

1. The Offset

Jang argues that an offset is a monetary gain for BSC, and thus a "recovery of damages." We agree. A cash offset is the functional equivalent of a cash payment. Instead of receiving a direct transfer from Cordis, BSC deducted the amount it would have received from the amount it owed Cordis for separate acts of infringement.

An illustration may be useful: Had BSC received a $2 billion check for the Jang-patent infringement, and then paid Cordis $3.725 billion out of its general funds for Cordis' separate claim, there would be no dispute that the Jang claim had produced $2 billion in "damages." BSC simply combined the transactions. Using the numbers from our illustration, BSC deducted $2 billion from its debt to Cordis, thereby receiving the $2 billion in the form of an "offset." It is still better off, by $2 billion, than it would have been without the Jang infringement claim. This is clearly a monetary gain.

Courts have long recognized the equivalence of a debt offset and a cash payment through the common-law "right of

12

setoff": "The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528 (1913)); *see also Chi. & N.W. Ry. Co. v. Lindell*, 281 U.S. 14, 17 (1930) (noting that discharging a debt by setoff is not "to be distinguished from payment in money"). In this case, BSC made money on the Jang patent. It lost money on Cordis' separate claim. That its gain and loss were consolidated to produce one net payment does not change the fact that the Jang patent produced a monetary gain for BSC.

The real question is whether that gain qualifies as a "recovery." We see no reason why it should not; it makes no difference to BSC's bottom line whether it receives a check for the Jang infringement claim or reduces its debt by the same amount.[6] The fact that BSC obtained a right to damages, and then regained the value of its lost profits through settlement, should be sufficient to demonstrate a "recovery." *See* BLACK'S LAW DICTIONARY 389 (9th ed. 2009) (defining "recovery" as, inter alia, "[t]he regaining or restoration of something lost or taken away" or "[t]he obtainment of a right to something (esp. damages) by a judgment or decree").

What is arguably ambiguous, however, is whether § 7.3(c) applies only when there is a net "recovery" in the "suit

_____

[6] The dissent begs the question of whether an offset qualifies as a recovery by unilaterally defining "recovery amount" to mean "net monetary payment."

13

or settlement" as a whole, or whether it applies to any recovery on the particular claims involving Jang patents, even if the suit as a whole produces a loss. The parties do not identify this point of uncertainty, but it may underlie their disagreement. If the provision is ambiguous in this respect, there is a material issue of disputed fact.

In sum: Viewing the facts in the light most favorable to Jang, as we must at this stage, *see Knepper*, 675 F.3d at 257, it is clear that the Jang infringement claim entitled BSC to damages, and resulted in a monetary gain – through the cash offset – of billions of dollars. It is arguably ambiguous whether this gain qualifies as a "recovery" pursuant to § 7.3(c). Because "any recovery of damages" in § 7.3(c) could reasonably be read to include the cash offset, the District Court erred in dismissing Jang's breach-of-contract claim as a matter of law. We will therefore vacate the judgment on the pleadings so that the case may proceed to discovery. *Cf. Gen. Convention of New Jerusalem in the U.S. of Am., Inc. v. MacKenzie*, 874 N.E.2d 1084, 1087 (Mass. 2007) (noting "that extrinsic evidence may be admitted when a contract is ambiguous . . . to remove or to explain the existing uncertainty or ambiguity"). The parties will then be able to present arguments as to whether § 7.3(c) applies to the cash offset with the benefit of a fuller record, either in motions for summary judgment or at trial.

## 2. The Licenses

Jang also argues that he was entitled to share in the value of the licenses that BSC recovered in the Cordis settlement. He contends that the parties did not contemplate the possibility of a non-monetary settlement, and that § 7.3(c)

14

is therefore ambiguous with respect to the licenses. Construing all the facts in his favor, it is possible that Jang and BSC failed to consider a settlement-in-kind when negotiating the Agreement. This does not, however, render § 7.3(c) ambiguous with respect to the licenses.

Jang relies on *Cofman v. Acton Corp.*, 958 F.2d 494 (1st Cir. 1992), in which the First Circuit, applying Massachusetts law, found an apparently clear contract provision to be ambiguous in context. In that case, Acton, the defendant corporation, had agreed to pay the plaintiff companies a sum of money if its stock rose above a certain price. *Id.* at 495. Later, its stock plummeting, Acton executed a "reverse stock-split" in which it drastically reduced the number of its shares on the market. *Id.* at 496. This had the effect of artificially increasing each share's par value by a multiple of five, far above the contractual threshold. *Id.* The plaintiffs demanded their money. *Id.* Acton refused on the ground that the provision was not meant to be triggered unless its fortunes improved, which they had not; the parties had simply not considered the possibility of stock-price manipulation. *Id.*

The First Circuit sided with Acton. *Id.* It found that the parties had not provided for stock-price manipulation, and that the payment provision could not be read to apply to manipulated price changes, because that would have allowed Acton to avoid reaching the threshold by manipulating par values downward. *Id.* at 497. The court therefore held that the provision was not triggered by Acton's reverse stock-split. *Id.* at 498.

15

Jang argues that the application of § 7.3(c) to a recovery of licenses is analogous. The Agreement does not explicitly speak to this situation. Construing the facts in the light most favorable to Jang, it is possible that the parties did not consider it. Jang contends that the contract is thus ambiguous, and that we cannot infer that § 7.3(c) was intended to exclude non-monetary recoveries, because that would allow BSC to evade its obligation at any time simply by arranging to receive its recovery in non-monetary form.

Jang's argument is compelling – but not, in the end, persuasive. First, Jang's situation is unlike *Acton* in that, whereas the *Acton* court was willing to read an implied exception into a contract, Jang asks us to read an additional obligation into the contract. The *Acton* court construed the parties' obligations more narrowly than a literal reading would suggest; Jang asks us to construe the parties' obligations more broadly. More importantly, though, *Acton* stands in tension with the great weight of Massachusetts contract law. The central mantra of that law is that contract terms must be interpreted according to their plain meaning. *See, e.g.*, *S. Union Co.*, 941 N.E.2d at 640. Only if their meaning is indeterminate may the court look to a provision's broader purpose for clarification. *Id.*

Section 7.3(c) plainly applies to monetary recoveries only. Even if this is because the parties considered no other kind, that omission does not render the scope of § 7.3(c) – which imposes an affirmative obligation on BSC – ambiguous. The contract simply does not require BSC to share the proceeds of a settlement-in-kind, and we cannot supplement the contract terms. *Cf. Winchester Gables, Inc. v. Host Marriott Corp.*, 875 N.E.2d 527, 535 (Mass. App. Ct.

16

2007) (holding that, although the literal application of the contract to an unforeseen situation produced an extreme result, the court is not "free to substitute" a more rational term).

It is true that this reading allows BSC to circumvent § 7.3(c) by electing to receive any recovery in non-monetary form. If BSC takes this course of action to intentionally thwart the purpose of the provision, however, the appropriate charge against it is violation of the implied covenant of good faith and fair dealing, not breach of the express contract terms. We agree with the District Court that BSC did not breach the Agreement's express terms in refusing to share the value of the Cordis licenses.

### B. Breach of the Implied Covenant of Good Faith and Fair Dealing

In the alternative to his breach of contract claim, Jang argues that the purpose of § 7.3(c) was to require BSC to share any kind of infringement recovery, and that BSC violated the implied covenant of good faith and fair dealing by structuring a settlement deal to thwart that purpose.

Under Massachusetts law, every contract includes an implied covenant of good faith and fair dealing ("implied covenant" or "covenant"). *See Anthony's Pier Four, Inc. v. HBC Assocs.*, 583 N.E.2d 806, 820 (Mass. 1991). The covenant provides "'that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (quoting *Drucker v. Roland Wm. Jutras Assocs.*, 348 N.E.2d 763, 765 (Mass. 1976)). Good faith requires "faithfulness to an agreed

17

common purpose and consistency with the justified expectations of the other party." RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a (1981); *see also Krapf v. Krapf*, 786 N.E.2d 318, 325 (Mass. 2003) (quoting § 205). Conduct that does not breach the express terms of the contract may still violate the covenant if it constitutes an "evasion of the spirit of the bargain," *id.* § 205 cmt. d, or if it violates "community standards of decency, fairness or reasonableness," *id.* § 205 cmt. a. "The covenant may not, however, be invoked to create rights and duties not otherwise provided for in the existing contractual relationship. . . ." *Uno Rests., Inc. v. Bos. Kenmore Realty Corp.*, 805 N.E.2d 957, 964 (Mass. 2004).

The District Court dismissed Jang's claim on the ground that "[t]here can be no breach of [the] covenant of good faith and fair dealing . . . in the absence of a breach of contract." *Jang*, 817 F. Supp. 2d at 416. This is incorrect. "A party may breach the covenant of good faith and fair dealing implicit in every contract without breaching any express term of that contract." *Speakman v. Allmerica Fin. Life Ins. & Annuity*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005) (applying Massachusetts law); *see also Krapf*, 786 N.E.2d at 325.

The appropriate question is whether Jang's allegations state a plausible claim that BSC intentionally subverted the purpose of the Agreement and Jang's justified expectations. The complaint alleged that Jang "reasonably expected" to share in "the value of the consideration received" by BSC in any suit or settlement against infringers, and further that BSC structured the settlement to "depriv[e]" him of that benefit, "while enriching themselves at Dr. Jang's expense." App. at 49. The complaint described the settlement and asserted that

18

BSC received a value of several billion dollars for the Jang patent infringement, while paying Jang nothing. These allegations are minimally sufficient to state a claim for violation of the implied covenant, and to survive dismissal on the pleadings.[7]

Viewed in the light most favorable to him, Jang's allegations describe a situation similar to cases in which the Massachusetts Supreme Judicial Court has found that a party violated the covenant by circumventing – rather than breaching – a contractual obligation. *See Krapf*, 786 N.E.2d at 324-26 (where a divorce settlement entitled the defendant's ex-wife to half of his military retirement benefits, he violated the covenant by electing disability benefits instead); *Nile v. Nile,* 734 N.E.2d 1153, 1160 (Mass. 2000) (where a divorce agreement required the defendant to leave two-thirds of his probate estate to his heirs, he violated the covenant by emptying his estate and transferring all his property to his new wife); *Fortune v. Nat'l Cash Register Co.*, 364 N.E.2d 1251, 1251-58 (Mass. 1977) (jury was permitted to find that a company breached the covenant by terminating the plaintiff's at-will contract in order to avoid paying him a commission).

---

[7] We do not, as the dissent alleges, hold that Jang could have "understood or expected[] that BSC was obligated to structure all settlements to provide for a monetary recovery." No one disputes BSC's right to control infringement suits. What Jang claims to have expected is simply that BSC would share the value of any recovery for infringement of his patents, whatever form it took. His allegation is that BSC intentionally arranged a non-monetary recovery in order to exploit the terminology of § 7.3(c) and deny any obligation to share the value with him.

19

If BSC intentionally circumvented its obligation to share infringement profits with Jang by arranging to receive those profits in a form that does not qualify as a "recovery," it may have violated the covenant.

The cases that BSC cites are not to the contrary. Where the Massachusetts Supreme Judicial Court has found an implied-covenant claim to be precluded as a matter of law, the plaintiff's expectations were "flatly inconsistent with the plain language" of the contract. *Merriam v. Demoulas Super Markets, Inc.*, 985 N.E.2d 388, 396 (Mass. 2013) (internal quotation marks omitted); *see, e.g.*, *Eigerman v. Putnam Invs., Inc.*, 877 N.E.2d 1258, 1265 (Mass. 2007) (company could not violate the covenant by refusing to repurchase employee stock shares when the stock-share plan explicitly gave it that right); *Lafayette Place Assocs. v. Bos. Redevel. Auth.*, 694 N.E.2d 820, 831 (Mass. 1998) (city agency could not violate the covenant by refusing to modify express deadlines in the contract).

In this case, nothing in the Agreement explicitly grants BSC the right to keep any non-monetary recovery without obligation to Jang. Nothing flatly contradicts Jang's asserted expectations. Nor is the alleged "spirit of the bargain" patently unreasonable, as in *Uno Rests.*, 805 N.E.2d at 962-65 (lessee could not reasonably expect its landlord to reject lucrative third-party offers for its leased space simply because it could not match their price). BSC may ultimately convince a fact-finder that Jang's expectation of sharing in any infringement recovery was not justified. At this stage, however, the reasonableness of his expectation is a disputed material fact.

Because there are disputed material facts as to the purpose of § 7.3(c) and the reasonableness of Jang's expectations, his implied-covenant claim is not barred as a matter of law, and the District Court erred by dismissing it on the pleadings.

### C. *Jang's § 9.4 Claim*

Finally, we briefly address Jang's arguments that the District Court erred in dismissing the complaint without considering his § 9.4 claim, and in denying his post-judgment motion for reconsideration and leave to amend. We review both decisions for abuse of discretion. *See United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011); *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011).

#### 1. Dismissal of the Complaint with Prejudice

The District Court declined to address Jang's § 9.4 claim on the basis that Jang had not pled it. This was correct. Jang asserts that he adequately pled the § 9.4 claim – that BSC breached § 9.4 by unilaterally granting Cordis perpetual licenses to Jang patents – because he pled "the elements of a claim for breach of contract." Appellant's Br. at 41. But to state a claim that can survive dismissal, a complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Jang's bare recital of the elements of a breach-of-contract claim was clearly insufficient to state a claim for breach of § 9.4. The supposed "clarification" in his brief in

21

opposition to judgment on the pleadings, which in fact presented an entirely new legal theory, did not cure the defective complaint. *See Frederico v. Home Depot*, 507 F.3d 188, 202-03 (3d Cir. 2007). Jang's proffer that he "would be prepared to amend" his complaint, App. at 559, does not change the analysis, because it cannot be construed as a motion for leave to amend. *See Ranke v. Sanofi-Synthelabo Inc.*, 436 F.3d 197, 206 (3d Cir. 2006). The District Court thus did not abuse its discretion in declining to address the § 9.4 claim, nor in dismissing the complaint with prejudice. *See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007) (holding that in non-civil rights cases, district courts have no obligation to offer leave to amend before dismissing a complaint unless the plaintiff properly requests it).

### 2. Denial of Jang's Motion for Reconsideration and Leave to Amend

Federal plaintiffs are entitled to amend their complaint once, as of right, within twenty-one days of serving it or of receiving a responsive pleading or motion to dismiss. FED. R. CIV. P. 15(a)(1). After the twenty-one days, "a party may amend its pleading only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2). A district court "should freely give leave when justice so requires," *id.*, but may deny leave on a finding of undue delay, bad faith, prejudice to the opposing party, or futility. *See Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001). When a party seeks leave to amend a complaint after judgment has been entered, it must also move to set aside the judgment pursuant to Federal Rule of Civil Procedure 59(e) or 60(b), because the complaint cannot be

22

amended while the judgment stands. *See Fletcher-Harlee Corp.*, 482 F.3d at 252; 6 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1489 (3d ed. 2013). We have held that "[w]here a timely motion to amend judgment is filed under Rule 59(e), the Rule 15 and 59 inquiries turn on the same factors." *Cureton*, 252 F.3d at 272; *see also Burtch*, 662 F.3d at 230.

In this case, the District Court denied Jang's Rule 15 and 59(e) motions on the ground that his delay in seeking leave to amend was undue and prejudicial to BSC.[8] Delay may become undue "when a movant has had previous opportunities to amend a complaint" but instead "delays making a motion to amend until after [judgment] has been granted to the adverse party," and when "allowing an amendment would result in additional discovery, cost, and preparation to defend against new facts or new theories." *Cureton*, 252 F.3d at 273. The District Court found that Jang's delay met these criteria. Jang could have moved to amend his complaint at any time before the District Court granted the dismissal. He offered no cogent reason for his failure to do so. Even on appeal, his only explanation is that "it was early in the case, the pleadings had not previously been tested, and so Dr. Jang clarified [the § 9.4 claim] in his briefs, indicated his willingness to amend the Complaint if

---

[8] Jang argues that the District Court improperly constrained its analysis to the typical Rule 59 analysis rather than consider the Rule 15 and 59(e) motions together. The District Court did consider the Rule 15 factors, however, and held that Jang's Rule 15 motion lacked merit even "independently of the court's analysis of the Rule 59 motion." App. at 6.

23

necessary, and then waited for the District Court to rule." Appellant's Br. at 54.

This court has declined to reward a wait-and-see approach to pleading. *See Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006) ("When a party fails to take advantage of previous opportunities to amend, without adequate explanation, leave to amend is properly denied."); *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 280 (3d Cir. 2004) ("Plaintiffs relied at their peril on the possibility of adding to their complaint. . . ."). While the District Court's cursory analysis of the delay and resulting prejudice was not optimal, the Court did not abuse its discretion in denying Jang's post-judgment motion for reconsideration and leave to amend.[9] We note, however, that because we are reversing the judgment on the pleadings, Jang remains free to file a new motion for leave to amend. We express no opinion as to the potential merit of that motion.

## IV. Conclusion

Viewing all the facts in the light most favorable to Jang, two of his claims are sufficiently colorable to survive judgment on the pleadings: (1) that BSC breached § 7.3(c), because the cash offset qualifies as a "recovery of damages"; and (2) that BSC violated the implied covenant of good faith and fair dealing by structuring a settlement to thwart the agreed purpose of § 7.3(c). The District Court thus erred in finding Jang's claims barred as a matter of law and

---

[9] We need not reach BSC's additional argument that amendment would have been futile.

24

granting judgment on the pleadings for BSC.  We will reverse the judgment and remand the case for further proceedings.

*Jang v. Boston Scientific Scimed, Inc.*, No. 12-3434

Barry, *Circuit Judge*, dissenting

The Majority concludes as follows: Dr. Jang's claim that BSC breached § 7.3(c) of the Agreement because the cash offset qualifies as a "recovery of damages," and his claim that BSC violated the covenant of good faith and fair dealing implicit in that Agreement by structuring a settlement to thwart the purpose of § 7.3(c), were "sufficiently colorable" to survive judgment on the pleadings. Maj. Op. at 21. It, thus, reverses the judgment, and remands for further proceedings. Because I believe § 7.3(c), the concededly key provision in this case, to be decidedly unambiguous, I respectfully dissent.

Section 7.3(c) requires BSC to pay Dr. Jang from the "balance, if any" from "any recovery of damages" received in a covered infringement suit against a third party. As the Majority concedes, the "any recovery of damages" language "plainly" refers to monetary recoveries only. *Id.* at 14. What it found to be ambiguous, however, was whether the cash offset here was a monetary recovery qualifying as a "recovery of damages" within the meaning of § 7.3(c). It unambiguously was not.

Under § 7.3(c), there can only be an additional earn out to Dr. Jang from the "balance," after expenses, of the "recovery amount," i.e. the net monetary payment, that BSC received from the "suit or settlement" of a covered infringement claim. BSC did not "recei[ve]" a net monetary payment in settlement of the Cordis litigation so there was no "balance" from which to calculate an additional earn out. That Dr. Jang may not have contemplated offsetting claims or non-monetary settlements, or have considered the possibility that broader terms— "benefit," "consideration," e.g.—might be necessary for a non-monetary recovery to be swept in, does not render § 7.3(c) ambiguous or require us to rewrite it in his favor. Under the unambiguous language of § 7.3(c), the earn-out provision was not triggered, and judgment was properly entered in favor of BSC on the breach of contract claim.

1

With respect to the claim for violation of the implied covenant, there is nothing in this record suggesting that Dr. Jang, in fact, understood or expected, or even *could* have understood or expected, that BSC was obligated to structure all settlements to provide for a monetary recovery; indeed, the Majority found even the allegations of the *complaint* to be only "minimally sufficient." *Id.* at 16. Moreover, any suggestion that Dr. Jang understood or expected that BSC had any such obligation would be belied by § 7.3(b), which states that "[BSC] shall have the right, but not the obligation, to institute, prosecute and *control* legal proceedings to prevent or restrain [third-party] infringement" (emphasis added), a provision that gives BSC broad, unqualified discretion to bring suit and make all decisions regarding suit, including the resolution of that suit. It is not for us to add limits to BSC's authority and thereby enable Dr. Jang to achieve collaterally what he neglected to achieve contractually. *See Uno Rests., Inc. v. Bos. Kenmore Realty Corp.*, 805 N.E.2d 957, 964 (Mass. 2004).

Finally, I note that, although the Majority has discerned a "material fact" or two in dispute as to the purpose of § 7.3(c) and the reasonableness of Dr. Jang's expectations, it nonetheless cites and does not question what the Massachusetts Supreme Judicial Court has decided: where the Court has "found an implied-covenant claim to be precluded as a matter of law, the plaintiff's expectations were 'flatly inconsistent with the plain language' of the contract." Maj. Op. at 17 (quoting *Merriam v. Demoulas Super Markets, Inc.*, 985 N.E.2d 388, 396 (Mass. 2013)). So, too, here—at least in my view.

I would affirm the judgment of the District Court.

2